# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-20889-CR-MARTINEZ/AOR

UNITED STATES OF AMERICA,

v.

DAVID JAMES GOLDAMMER,

Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant David James Goldammer's ("Defendant" or "Goldammer") Motion to Suppress Evidence (hereafter, "Motion to Suppress") [D.E. 26]. This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 27]. The undersigned held an evidentiary hearing on this matter on February 28, 2019 [D.E. 36]. For the reasons stated below, the undersigned respectfully recommends that Goldammer's Motion to Suppress be DENIED.

## PROCEDURAL BACKGROUND

On November 13, 2018, Goldammer was charged in a single count indictment with the following offense:

> On or about October 25, 2018, in Miami-Dade County, in the Southern District of Florida, the defendant
>
> DAVID JAMES GOLDAMMER,
>
> did knowingly possess a firearm, that is, a rifle having a barrel or barrels of less than 16 inches in length, as defined in Title 26, United States Code, Section 5845(a)(1), which firearm was not registered to the defendant in the National

Firearms Registration and Transfer Record, as required by Title 26, United States Code, Section 5841, in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

See Indictment [D.E. 6].

On October 25, 2018, officers of the Miami Beach Police Department ("MBPD") found Goldammer asleep in his pick-up truck, which was illegally parked in an alleyway. After Goldammer refused a sobriety test, he was arrested and charged with driving under the influence ("DUI"), open carry of a firearm, and carrying a concealed weapon. In connection with Goldammer's arrest, MBPD officers conducted a search of Goldammer's vehicle, which uncovered the unregistered short barrel rifle that is the subject of the Indictment. In his Motion to Suppress, Goldammer contends that the search of his vehicle did not comply with MBPD's guidelines for vehicle inventory searches; hence, it was an investigatory search conducted without a warrant, rather than a legal inventory search. Thus, Goldammer seeks an order suppressing the short barrel rifle upon which the case against him is predicated.

## APPLICABLE LAW

### 1. The Fourth Amendment's protection against illegal searches

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "[I]t is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Mincey v Arizona, 437 U.S. 385, 390 (1978) (citations omitted). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." United States v. Watkins, 760 F.3d 1271, 1278

(11th Cir. 2014) (citations omitted).

*Towing and inventory searches of vehicles*

"[I]nventory searches are . . . a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987) (citing Illinois v. Lafayette, 462 U.S. 640, 643 (1983); South Dakota v. Opperman, 428 U.S. 364, 367-76 (1976)). However, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990). As explained by the Eleventh Circuit:

> The Supreme Court has indicated that inventory searches are only justifiable if performed pursuant to explicit and comprehensive procedures. Without such procedures, officers are left with no guidance in the performance of a duty which is meant not as an investigatory technique but as a means for safeguarding individuals' possessions and protecting the police from false claims. If a search is to be upheld under the inventory search doctrine, therefore, the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy.

United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991) (citation omitted).

The MBPD has an established policy on towing and impounding vehicles, which provides, in pertinent part:

VI. Impound / Tow Procedures

A. When an officer determines that a vehicle is to be towed / impounded he will:

*** 

3. Complete a "Vehicle Storage Receipt" . . .

4. Visually inspect the exterior and interior of the vehicle and note damage on the "Vehicle Storage Receipt."

5. It is essential that a complete inventory be conducted of every vehicle. When an officer initiates a tow, he becomes responsible for the vehicle. He is liable for the vehicle, its parts, and contents.

6. The interior of the vehicle will be carefully inventoried, including under seats, in the trunk, and all compartments, to determine items present.

\*\*\*

8. To ensure that liability does not attach for property located within any package or container, the contents of the package or container, whether it is opened or closed, will be accounted for and inventoried.

   a. If any container, trunk or compartment is locked, and the key is not available, the officer will contact a supervisor before taking any further action.

9. Valuable items which are portable and all firearms will be placed in the Property and Evidence Unit for safekeeping and noted on the "Vehicle Storage Receipt."

<u>See</u> MBPD Standard Operating Procedure #133, Towed/Impounded Vehicles (hereafter,

MBPD SOP #133") [D.E. 33-3].  In addition:

All vehicle inventories will be recorded on an officer's body worn camera (BWC). If the inventorying employee is not equipped with a BWC, an officer so equipped will respond to the vehicle's location.  The inventory will not begin until an officer equipped with a BWC is on scene.  The entire inventory will be recorded, the [Officer Incident Report] OIR notated that the inventory was captured on a BWC, and the BWC inventory data will be downloaded pursuant to SOP #152, Body Worn Cameras.

<u>See</u> MBPD General Order 17-04, Inventory Search – Towed/Impounded Vehicles

(hereafter, "MBPD GO 17-04") [D.E. 33-4].

## 2. **Fruit of the Poisonous Tree**

Under the long established exclusionary rule, "evidence seized during an unlawful search

[can] not constitute proof against the victim of the search."  <u>Wong Sun v. United States</u>, 371 U.S.

471, 484 (1963) (citing <u>Weeks v. United States</u>, 232 U.S. 383 (1914)).   "The exclusionary

prohibition extends as well to the indirect as the direct products of such invasions."  <u>Id.</u> at 484-85

(citing <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385 (1920)).   Moreover, the

exclusionary rule applies equally to physical and verbal evidence.  <u>Id.</u> at 485.

## FINDINGS OF FACT

### I.    Testimonial and documentary evidence

1.     The following witnesses testified at the February 28, 2019 evidentiary hearing: MBPD Officer Manuel Jas ("Officer Jas"), MBPD Officer Ricardo Castillo ("Officer Castillo"), Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Max Allen (Agent Allen"), and Robert Lapietra, Jr. ("Mr. Lapietra").  See Exhibit & Witness List [D.E. 37].

2.     The following documents were admitted into evidence: Government's Exhibits 1 through 19; and Defendant's Exhibits 5 through 15.  Id.

### II.   Facts

#### A.  *Officer Jas*

3.     Officer Jas has been employed with the MBPD patrol unit since November 18, 2017.  He was previously in the United States Army for approximately four years as a military police officer.

4.     On October 25, 2018, at approximately 1:34 a.m., Officer Jas was assigned to the MBPD patrol unit for the section of Miami Beach known as the "entertainment district," encompassing the area from Fifth Street to Fifteenth Street and from Ocean Drive to Washington Avenue.

5.     At that time, Officer Jas was dispatched to answer a call reporting a suspicious vehicle in an alleyway, specifically, the 1400 block of Ocean Court.

6.     Officer Jas responded to the scene with Officer Castillo (together, "the Officers"), each riding their bicycles, within three to four minutes of the call.

7.     As the Officers headed northbound on Ocean Court, they observed a large red pickup truck (hereafter, the "Vehicle") at the intersection of Fourteenth Place.  The Vehicle was

parked against the direction of traffic in the one-way alleyway.  Additionally, there was a no-parking sign at the Vehicle's location.

8.      As the Officers parked their bicycles and approached the Vehicle, they shined their flashlights and observed an individual who was asleep in the driver's seat.  They also observed two open bottles of beer, one empty and one half full.  Officer Castillo was then able to wake up the individual by pointing his flashlight at the individual's face.

9.      At the evidentiary hearing, Officer Jas identified the individual as Goldammer.

10.     The Officers asked Goldammer to lower both front windows.  As Goldammer rolled down the passenger's side window, Officer Jas noticed a firearm in the cup holder.  At that point, Officer Jas drew his weapon and placed it at low ready, and he advised Goldammer not to reach for his firearm.  Officer Jas also observed a second firearm on the right side of the center console.

11.     Officer Jas instructed Goldammer to keep his hands visible and noted from a tattoo on Goldammer's left forearm that he was a veteran of Operation Iraq Freedom ("OIF").  While mentioning this observation to Officer Castillo, Officer Jas asked Goldammer to step out of the Vehicle.  Given his experience in the military police, Officer Jas was concerned that Goldammer might be going through some crisis and need assistance.

12.     The Officers assisted Goldammer in getting out of the Vehicle and had him place his hands on the Vehicle.  Officer Castillo then patted him down for weapons, found a third firearm on his right side waistband, and removed it.

13.     At that point, Officer Jas placed Goldammer in handcuffs for officer safety.

14.     On further pat down, the Officers located in Goldammer's wallet his ID and a South Dakota concealed weapons permit (hereafter, "S.D. Permit").

15.     When asked what was going on, Goldammer responded in a low tone, "life," which

led Officer Jas to believe Goldammer was going through a rough patch.

16.     Goldammer was then placed on the sidewalk, away from the Vehicle and the weapons.  Officer Jas tried to engage him in conversation to see if he needed help, while Officer Castillo called in the firearms to MBPD's records channel to find out if they were stolen.  Officer Castillo also called in the S.D. Permit.

17.     The Officers then proceeded with a DUI investigation, given that Goldammer had been sitting in the driver's side of the Vehicle with the keys in the ignition.  However, Goldammer refused a sobriety test.  As a result, he was immediately placed under arrest.  On further pat down, Officer Castillo located a speed loader cartridge with some rounds in it.[1]

18.     Because the Officers had arrived at the scene on their bicycles, they called for back up to transport Goldammer.  Officer Melendez arrived in a police car and Goldammer was placed in the prisoner compartment.

19.     After securing Goldammer, the Officers started conducting an inventory search of the Vehicle, which had to be towed because Goldammer had been arrested, the Vehicle was improperly parked, and there was no one else around to take custody of it.

20.     Officer Castillo initially assisted in the inventory search, but left for the police station on his patrol bicycle as Officer Melendez transported Goldammer there.

21.      Officer Jas explained that his usual method for conducting an inventory search is to start at the driver's side, work his way back and around the vehicle, and check any other outside compartments, looking for anything that is portable and of value that needs to be either placed for safekeeping or impounded.  MBPD SOP #133 particularly requires that firearms be impounded.

---

[1] When cautioned that carrying weapons into jail was not OK, Goldammer bizarrely responded, "that's not what I do; I kill people."

22.     In the rear of the Vehicle, Officer Jas found a green olive drab tactical bag, which he called a "go bag," containing a few loaded AR-15 magazines. This led him to believe that a rifle was possibly inside the Vehicle. He also noticed an olive drab rifle bag under the rear driver's side seat through a crack below the seat.

23.     Officer Jas tried to find a latch that would release the top of the seat without success. However, he did not initially notice any locks or believe that the compartment was locked.

24.     For approximately twenty minutes, Officer Jas searched YouTube videos on his phone in an attempt to find a way to enter the rear seat compartment, also without success.

25.     Officer Jas then proceeded to the other side of the Vehicle and found that the rear seat on that side did flip open. He also noticed that the rifle bag under the rear driver's side seat was accessible from that side just by pulling it out.

26.     Officer Jas pulled the rifle bag from that side. When he opened the rifle bag, Officer Jas found a short barrel rifle, along with a longer upper receiver and two additional magazines. One of the magazines was loaded and inserted in the short barrel rifle. Officer Jas removed the magazine and set aside the rifle bag and its contents to continue the inventory search.

27.     At that time, Officer Jas' sergeant arrived on the scene. Office Jas discussed the case with his sergeant for approximately five to ten minutes.

28.     Officer Jas advised his sergeant of his unsuccessful attempt to figure out how to open the compartment below the rear driver's side seat. The sergeant suggested to Officer Jas that he try the Vehicle's valet key. Upon inspection, Officer Jas realized that the shape of the key matched a small keyhole on the side of the seat. Officer Jas then successfully used the valet key to open the compartment.

29.     Upon inspection, Officer Jas found eight to nine more loaded magazines and a

tactical bullet proof vest.

30.     Office Jas continued to conduct the inventory search and used the valet key to open the Vehicle's center console, where he found two additional firearms.[2]

31.     Officer Jas then moved to the truck bed of the Vehicle, which had a locked cover. Officer Jas was able to pull down the tailgate and observed with his flashlight multiple military style ammunition cans ("ammo cans").  Office Jas was unable to unlock the bed cover, so he climbed onto the truck bed to retrieve the ammo cans, which he was able to do after setting aside a cooler, a spare tire, tools and what looked like a generator or welding machine.  This concluded the inventory search.

32.     Officer Jas then proceeded to complete a vehicle storage receipt, which he called a "tow sheet." Also, all of the property removed from the Vehicle was listed on a "property receipt." This concluded Officer Jas' involvement in the case.

33.     With regard to the S.D. Permit, Officer Jas noted that it was laminated, that the edges were peeling, and that it appeared different from the concealed weapons permits that he was used to seeing.  See Gov't Ex. 2 (still photo of S.D. Permit taken with Officer Jas' BWC).

34.     Officer Jas also identified the following still photos taken with his BWC at the scene: Officer Jas removing the rifle bag from the passenger side rear seat that he was able to lift up (Gov't Ex. 3); rifle bag with short barrel rifle and longer upper receiver (Gov't Ex. 4); rifle bag with revolver, short barrel rifle, upper receiver, multiple ammo cans and ammunition (Gov't Ex. 5); rifle bag with short barrel rifle, upper receiver, revolver, ammunition, tactical vest, multiple loaded magazines, and two brand new magazines in their original packaging (Gov't Ex. 6).

---

[2] Officer Jas testified that none of the firearms were found to be stolen.

35.     Officer Jas also identified the following photos taken in front of the MBPD Property and Evidence Unit of items retrieved from the Vehicle: tactical vest, ammo cans, and ammunition (Gov't Ex. 7); pistol, revolver, loaded magazines, short barrel rifle, money, and tow sheet (Gov't Ex. 8); rifle bag, two magazines, upper receiver, two pistol holsters, and rifle sling (Gov't Ex. 9).

36.     Officer Jas also identified a photo taken on the Property and Evidence Unit desk of all of the firearms found in the Vehicle, except for the upper receiver; and the firearms found on Goldammer's person (Gov't Ex. 10).

37.     Officer Jas compared two pictures of South Dakota concealed weapons permits: one that looked like Goldammer's S.D. Permit entitled "Permit to Carry a Concealed Pistol" and one entitled "Regular Concealed Carry Permit" showing a colored state seal background (Gov't Exs. 11 and 12).  The latter was similar to the results Officer Jas had obtained when he searched what a South Dakota concealed weapons permit looks like.

38.     At the time of Goldammer's arrest, Office Jas did not believe that Goldammer's S.D. Permit was valid.  Goldammer was charged with DUI, open carry of a firearm, and carrying a concealed weapon.

39.     Officer Jas identified the tow sheet he completed for the Vehicle.  See Gov't Ex. 13. According to Officer Jas, the tow sheet identified the items that remained in the Vehicle when it was towed in a line next to the words "Miscellaneous Property Left in Vehicle." Id.  Officer Jas wrote on that line: "Cooler, Tools, New Generator, Knife, Scissors, Misc Items." Id.

40.     Officer Jas also identified the property receipt that he completed for all of the items that were impounded upon Goldammer's arrest.  See Gov't Ex. 14.  The property receipt listed all of the firearms, ammo cans, ammunition, loose rounds, and currency.  Id.  According to Officer

Jas, none of these items could go with Goldammer to jail; and none of the firearms and paraphernalia could remain in the towed Vehicle per MBPD standard operating procedure.

41.     Office Jas also identified MBPD IOP # 133.  See Gov't Ex. 15.  Officer Jas testified that this document was his guide to conducting the inventory search of the Vehicle.

42.     Officer Jas also identified MBPD GO 17-04.  See Gov't Ex. 16.  According to Officer Jas, this document governs the use of the BWC in conducting an inventory search prior to a vehicle tow.

43.     Officer Jas also identified MBPD standard operating procedure 152, which governs his use of the BWC.  See Gov't Ex. 17.

44.     Officer Jas testified that, on October 25, 2018, he was wearing his department-issued BWC, and he used it in accordance with the MBPD standard operating procedures while conducting the search of the Vehicle.

45.     During the evidentiary hearing, Office Jas narrated various scenes of the video taken by his BWC on October 25, 2018.  The video scenes comported with Officer Jas' earlier testimony describing the events that took place that day.[3]

46.     At one point, Office Jas is shown talking on his phone.  Officer Jas testified that he was speaking to his sergeant; therefore, per MBPD policy, he was required to turn off the BWC during the conversation.  After the conversation ended, Officer Jas turned his BWC back on.

47.     Officer Jas also turned his BWC off while he spoke to his sergeant on the scene. He realized that the BWC was off while opening the driver's side rear seat compartment with the

---

[3]  Officer Jas acknowledged that the time stamps shown on the BWC videos did not comport with the actual time of the events.  Defendant's counsel also acknowledged the time differences at the evidentiary hearing. The undersigned attaches no significance to this discrepancy since the parties acknowledged that the time intervals were correctly recorded.

valet key, at which time he turned the BWC back on.

48.     Additionally, Officer Jas believed that the top switch on the BWC was pressed down while he crawled on the truck bed to retrieve the ammo cans he had seen with the aid of his flashlight, which resulted in the BWC being accidentally turned off.  As he resumed the inventory search, Officer Jas realized that the BWC was off and he immediately turned it back on.

49.     On cross-examination, Officer Jas testified that, as part of the inventory search of the Vehicle, he found a few targets, like those used at a shooting range.

50.     Officer Jas acknowledged that a leather jacket that was in the Vehicle was not specifically listed in the tow sheet, but would be encompassed in the "Misc Items" entry.

51.     Officer Jas also acknowledged that a welding mask similar to the item shown in Def's Ex. 14 was found in the Vehicle.  Officer Jas acknowledged that the welding mask was not specifically listed in the tow sheet.

52.     Officer Jas explained that the space for listing items in the tow sheet was limited, so he did not itemize every single item in the Vehicle.  For example, he used the description "Tools" for multiple tools.  He also explained that the tow sheet was only one page long.  By contrast, the property receipt was several pages long.

53.     Officer Jas did not recall opening a brown box that was in the Vehicle, and he did not inventory the items inside it.

54.     Officer Jas did open a cooler and found water and beer bottles in it.  However, he did not list these contents in the tow sheet.  Officer Jas also acknowledged that there was a second cooler in the Vehicle that he did not specifically identify in the tow sheet.

55.     Officer Jas testified that he tried to lift the driver's side rear seat several times, not thinking that it was locked but that it was latched.  Officer Jas was not able to access the

compartment below the seat until he used the valet key to unlock it.

56.     Officer Jas included jumper cables that he found in the Vehicle under "Tools" or "Misc Items." He noted that there were a lot of tools in the Vehicle.

57.     Officer Jas also testified that the item that he described as "Generator" in the tow sheet turned out to be a welding machine.

58.     Officer Jas testified that he had conducted vehicle inventory searches in accordance with MBPD SOP #133 before searching the Vehicle. According to Officer Jas, because the tow sheet is vague, MBPD issued GO 17-04, requiring that inventories be captured on BWCs.

59.     Officer Jas testified that he conducted the inventory search of the Vehicle carefully, listing items on the tow sheet and impounding what he had to impound.

60.     Officer Jas testified that he located a knife in the space on the driver's side door where the handle would be; and that he included "Knife" and "Scissors" in the tow sheet.

61.     Based on his military experience, Officer Jas correlated the presence of the go bag in the Vehicle with the potential presence of a rifle. When Officer Castillo handed the go bag to him and he saw the AR-15 magazines in it, that confirmed his suspicion.

62.     Officer Jas continued the inventory search and, when he saw the rifle bag under the driver's side rear seat, he concentrated on looking for a rifle and getting access to the rifle bag. The standard operating procedures required him to impound any firearms, so he could not ignore what he had seen, and he had to try to get the rifle out of the Vehicle. At that point, that was his priority.

63.     When asked why he did not contact someone to advise he could not get into a locked compartment below the driver's side rear seat, in accordance with MBPD SOP #133, Officer Jas testified that his sergeant showed up on the scene so there was no need for him to do so.

64.     Officer Jas agreed that, prior to the time his sergeant arrived on the scene, twenty minutes of search time had elapsed without him contacting anyone, but he stated that he had not given up yet at that point.

65.     At the time Officer Jas found the short barrel rifle, he did not have an understanding that the item had evidentiary value; he was doing everything possible to access it for inventory purposes because he was required to remove all firearms from the Vehicle per standard operating procedures.

66.     During the course of the inventory search, it did not come to Officer Jas' attention that the short barrel rifle had evidentiary value as such, because it had been cleared after a records check for stolen firearms.

67.     Officer Jas testified that he took the photographs taken at the police station of the items found in the Vehicle with his phone.  At that time, it was his understanding that the firearms had evidentiary value for the open carry and carrying a concealed weapon charges.

68.     Officer Jas reaffirmed that, at the time, he did not think that the S.D. Permit was legitimate, given that the police records channel could not independently verify it.

69.     Officer Jas agreed that, based on the BWC timestamps, forty minutes had passed between the time he started the inventory search and the time he realized that the valet key could open the locked compartment under the driver's side rear seat.

70.     On re-direct examination, Officer Jas testified that, once he found the go bag, his main concern was that there was a rifle inside the Vehicle, and that he had to inventory the Vehicle. He would have been derelict in his duty if he had not tried to find the rifle after seeing the go bag and the rifle bag.  It was not initially clear to Officer Jas that the compartment under the driver's

side rear seat was locked; and he reaffirmed that he was able to retrieve the rifle bag simply by pulling it with his hands from the passenger side.

### B. *Officer Castillo*

71.     Officer Castillo worked as a Florida Highway Patrolman for four years prior to joining the MBPD patrol unit.

72.     On October 25, 2018, at approximately 1:30 a.m., Officer Castillo was working and wearing a BWC, which captured the events at issue.

73.     Officer Castillo was dispatched to the 1400 block of Ocean Court regarding a white male who was passed out in a red truck.

74.     It took Officer Castillo, along with Officer Jas, approximately five minutes to arrive at the scene.

75.     The Officers initially observed a red Ford pickup truck, namely, the Vehicle, improperly parked on Ocean Court with a white male asleep at the driver's seat.

76.     Ocean Court is a one-way alleyway and the Vehicle was facing the wrong way.

77.     Parking was not permitted on the alleyway.

78.     The Vehicle was running.

79.     Officer Castillo shined his flashlight at the individual, who appeared to be asleep, and the individual woke up.  The individual was slumped on his right side and he had a liquid stain on his shirt.  There appeared to be some glass beer bottles in the center console.

80.     At the evidentiary hearing, Officer Castillo identified the individual as Goldammer.[4]

81.     Officer Castillo found a revolver in Goldammer's front waistband.  Two handguns

---

[4] At this point in the proceedings, Defendant stipulated that there was probable cause for his arrest.

were found in the center console area.

82.      Officer Castillo found a concealed weapons permit in Goldammer's wallet, namely, the S.D. Permit.

83.      The S.D. Permit had no watermark, or a picture ID, and the laminate edges were completely peeled.  The S.D. Permit appeared fake to Officer Castillo.

84.      Officer Castillo eventually obtained Goldammer's social security number and he contacted the MBPD records unit to check his criminal history and the serial number on the firearms.

85.      The firearms came back not stolen.  The records channel personnel were unable to verify the validity of the S.D. Permit.

86.      Officer Castillo testified that Gov't Ex. 18 was a fair and accurate description of how Goldammer looked at the time of the arrest.  See Gov't Ex. 18.

87.      Officer Castillo initially assisted with the inventory search of the Vehicle.

88.      Officer Castillo found the go bag with several rifle caliber magazines and a rifle round.  This led him to believe that there was probably a rifle in a military style tactical bag that he could see under the driver's side rear seat but could not access.

89.      Officer Castillo left the scene a few minutes after the inventory search of the Vehicle started to process Goldammer at the police station.

90.      During his participation in the inventory search of the Vehicle, Officer Castillo came across a knife with a swastika on it.  This raised his level of concern because the nearby area has a high Jewish population and several synagogues.

91.     Officer Castillo's BWC was turned off at several junctures, including on his way to the police station while riding his patrol bicycle; but it was turned on once he arrived at the scene.

92.     On cross examination, Officer Castillo confirmed that the area where he and Officer Jas were patrolling on October 25, 2018 is designated as the entertainment district; and he acknowledged that the area is frequented by tourists.

93.     Officer Castillo clarified that the knife he found in the Vehicle was a pocket knife, the size of a finger; and that the swastika was approximately the size of a dime.

**C. Agent Allen**

94.     Agent Allen has worked at ATF for approximately three years. Before that, he was a special agent and a uniformed division officer with the Secret Service.

95.     Agent Allen's duties with ATF involve the investigation of gun crimes, illegal firearms, and firearms trafficking.

96.     Agent Allen learned of Goldammer's arrest from MBPD Officer Mercado, who informed him that Goldammer had multiple firearms. Around the same time, a co-worker sent to Agent Allen a Twitter post from the MBPD that included a picture of the firearms seized from Goldammer. See Gov't Ex. 19.

97.     Agent Allen recognized from the Twitter picture the short barrel rifle as one manufactured by DPMS Firearms. It appeared to Agent Allen from the picture that the short barrel rifle was shorter than sixteen inches in length.

98.     According to Agent Allen, such a rifle requires registration with ATF and payment of a tax stamp pursuant to the National Firearms Registration Act.

99.     Agent Allen explained that, together, the lower receiver, which bears the serial number, and the upper receiver, which has the barrel, make up the entire firearm.  Thus, a lower receiver together with a short barrel upper receiver requires registration and payment of the tax stamp.

100.     After seeing the Twitter picture, Agent Allen asked the MBPD evidence custodian to measure the rifle, and the latter reported that it was less than sixteen inches.

101.     Agent Allen then went to see the rifle and confirmed that it was under sixteen inches in length.

102.     Officer Allen was also initially concerned that the rifle might be military property because it bore the acronym USMC next to the serial number.  Officer Allen later learned that the rifle was not military property.

103.     Officer Allen relayed the information he found to the appropriate ATF branch and learned that the short barrel rifle was not registered with ATF and had not been issued a tax stamp.

104.     On cross-examination, Agent Allen testified that the co-worker who forwarded the Twitter post to him also told him that the short barrel rifle appeared to be short.

105.     Agent Allen also testified that, when he initially spoke to Officer Mercado, he did not have a basis to inspect the firearms that were seized from Goldammer because he had no information that they were illegal.  Therefore, he simply told Officer Mercado to take them for safekeeping.

106.     Officer Allen's knowledge at that time regarding the firearms was limited to being informed that their seizure had to do with a DUI arrest.

107.    Agent Allen acknowledged that, after he viewed the short barrel rifle, he shipped it to West Virginia for additional forensic examination by the firearms technology criminal branch of ATF.

108.    Agent Allen acknowledged that, at no point prior to his sending the short barrel rifle to West Virginia, was a warrant sought or obtained.

109.    On re-direct examination, Agent Allen testified that he first decided to examine the short barrel rifle after he received the Twitter post with the picture.

110.    Agent Allen reaffirmed that possession of a short barrel rifle whose barrel is less than sixteen inches in length is illegal without a tax stamp.

111.    After he viewed the short barrel rifle, Agent Allen had an obligation, as an ATF agent, to verify whether it was legally possessed.

### D. Mr. Lapietra

112.    Mr. Lapietra was with Goldammer in Miami Beach the night before his arrest.  The two had been working together as welders at an Amazon facility.  That evening, they separated, and Mr. Lapietra went home in a taxi.

113.    Mr. Lapietra was familiar with the Vehicle and claimed that there were new scratches on it and a door ding after it was released from the tow yard.

114.    Mr. Lapietra acknowledged that there was "stuff" in the Vehicle when he and Goldammer picked it up.

115.    Mr. Lapietra identified pictures of the Vehicle that were taken after it was picked up from the tow yard.  See Def's Exs. 5-13.

116.    One of the pictures showed the locked compartment under the driver's side rear seat.  Mr. Lapietra claimed that the key hole looked broken, as if someone had pried it with a screwdriver.

117.    One of the pictures also showed the truck bed roll top and various items on the truck bed.

118.    Mr. Lapietra identified a multipurpose welding machine, which he valued at approximately $2,500 to $3,000.

119.    Mr. Lapietra also testified that there was a welding helmet inside the Vehicle, which he valued at $225 to $250.

120.    Mr. Lapietra also testified that there was a black leather motorcycle jacket in the Vehicle, which Goldammer purchased for $100 in his presence in Kansas City.

121.    On cross-examination, Mr. Lapietra acknowledged that his relationship with Goldammer is more than one of casual co-workers, since they know each other's families, and his children call Goldammer "Uncle Dave."  According to Mr. Lapietra, he and Goldammer are like brothers.

122.    Mr. Lapietra also testified that he and Goldammer had shared housing during their temporary work at the Amazon facility.

123.    Mr. Lapietra further testified that, the night before Goldammer's arrest, he and Goldammer had been hanging out in South Beach, and that he was forced to take a cab home because Goldammer did not answer his calls or text messages after the two were separated.

124.    Mr. Lapietra acknowledged that, prior to Goldammer's arrest, there was clutter in the Vehicle and that it needed to be cleaned up.  Mr. Lapietra had no knowledge regarding the short barrel rifle.

### III.   Credibility assessments

125.   The undersigned found Officer Jas' testimony to be direct, forthright, credible and consistent with the videos from his BWC.

126.   The undersigned found the testimony of Officer Castillo to be credible and consistent with that of Officer Jas.  The undersigned notes that Officer Castillo mostly participated in the arrest of Goldammer, which has not been challenged, and that he assisted in the inventory search of the Vehicle for only a limited time.

127.   The undersigned found the testimony of Officer Allen to be professionally qualified, reasonable and credible.

128.   The undersigned found Mr. Lapietra's testimony to be generally credible, while taking into account his close relationship with Goldammer.  The undersigned assigns no credibility to Mr. Lapietra's claim that a screwdriver was applied to the lock under the driver's side rear seat.

## CONCLUSIONS OF LAW

As noted above, Defendant seeks to suppress the short barrel unregistered rifle upon which the charges against him are predicated.  Defendant argues that the search conducted by Officer Jas was an investigatory search, rather than an inventory search, which is a recognized exception to the Fourth Amendment's warrant requirement.  Bertine, 479 U.S. at 371; Lafayette, 462 U.S. at 643; Opperman, 428 U.S. at 367-76.

Defendant primarily relies for this proposition on the time it took for Officer Jas to try to access the locked compartment below the driver's side rear seat where the rifle bag containing the short barrel rifle had been located, which Defendant argues violated MBPD SOP #133.  However, Office Jas credibly testified that he did not initially believe that the compartment was locked and that it was only latched; that he did not need to call for assistance because his sergeant showed up

at the scene twenty minutes into the search; and that he did not realize that the valet key would open the compartment until his sergeant suggested it.  In any event, by the time the sergeant arrived, Officer Jas had succeeded in retrieving the rifle bag by lifting the passenger side rear seat and accessing the rifle bag from that side, simply by pulling it with his hands without the use of any tools.  Officer Jas had initially suspected that there was a rifle in the Vehicle, based on the presence of the go bag and its association, in his military experience, with rifles; and this suspicion was confirmed when the go bag was found to contain AR-15 magazines.  Additionally, Officer Jas credibly testified that his rationale for concentrating his efforts on retrieving the rifle bag was that he had the duty to impound all firearms found in the Vehicle, rather than to gather evidence against Defendant.

Defendant also challenges Officer Jas' compliance with MBPD SOP # 133 in terms of the lack of detail in the tow sheet list of valuable items found in the Vehicle.  Officer Jas credibly explained that there were a lot of items in the Vehicle, and that the labels "Tools" and "Misc Items" were meant as a catchall.  Officer Jas also testified that having the inventory search recorded in his BWC served to verify the accuracy of his paperwork.  Having considered Officer Jas' credible testimony, the undersigned finds that he adequately complied with MBPD SOP #133 and that the minor shortcomings argued by Defendant did not transform the inventory search into an investigatory one.  Wells, 495 U.S. at 4; Williams, 936 F.2d at 1248.

Goldammer also relies on Officer Jas' BWC having been turned off at several junctures to challenge the inventory search.  However, Officer Jas adequately and credibly explained those instances as being in compliance with MBPD policy or being the result of accidental shut offs.

Having found that the short barrel rifle was properly seized pursuant to the inventory search of the Vehicle, the undersigned finds no merit in Defendant's argument that Officer Allen was

required to obtain a warrant prior to shipping the short barrel rifle to West Virginia for forensic examination, given that the rifle had been legally seized and was in the custody of MBPD by the time Officer Allen examined it.

Finally, because the search of the Vehicle did not violate the Fourth Amendment, the evidence recovered as a result of the search—the unregistered short barrel rifle—is not subject to the exclusionary rule as fruit of the poisonous tree. See Wong Sun, 371 U.S. at 484-88.

## RECOMMENDATION

In accordance with the foregoing, the undersigned respectfully recommends that Defendant's Motion to Suppress [D.E. 26] be DENIED.  Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez.  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 18th day of March, 2019.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE


Copies provided to:
United States District Judge Jose E. Martinez
Counsel of Record